No. 12-17734

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

PETER DEACON,

Plaintiff-Appellant,

v.

PANDORA MEDIA, INC.,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of California,
Case No. 4:11-cv-04674-SBA
The Honorable Saundra B. Armstrong, United States District Judge

_____

PLAINTIFF-APPELLANT'S OPENING BRIEF

_____

Jay Edelson (jedelson@edelson.com)
Ryan D. Andrews (randrews@edelson.com)
Ari J. Scharg (ascharg@edelson.com)
J. Dominick Larry (nlarry@edelson.com)
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .............................................................. 1

ISSUE PRESENTED FOR REVIEW ...................................................... 2

PERTINENT STATUTORY PROVISIONS ............................................ 2

STATEMENT OF THE CASE .................................................................. 2

STATEMENT OF FACTS ......................................................................... 4

I.   Pandora Customers Download Sound Recordings from Pandora .. 4

    II.   Pandora Disclosed Deacon's Music-Rental History to
        the Public At-Large ............................................................. 5

III.  The District Court Held that Pandora Does Not Rent or Lend
     Sound Recordings Because its Customers Do Not Take
     Possession of, Pay for, Return, or "Volitionally Use" the
     Audio Files Temporarily Stored on Their Computers .................... 7

SUMMARY OF THE ARGUMENT ........................................................ 9

STANDARD OF REVIEW ...................................................................... 12

ARGUMENT ........................................................................................... 13

I.   The Commonly Understood, Everyday Meanings of "Rent" and
    "Lend" Demonstrate that Pandora Rents or Lends Sound
    Recordings to its Users ................................................................ 14

    A.   The District Court's payment, possession, and use
        requirements cannot be reconciled with the everyday
        meanings of "rent" and "lend" ............................................. 15

    B.   The District Court erred by finding that Deacon does not
        "volitionally use" the recordings lent to him by Pandora .... 23

C.    The District Court did not consider the VRPA's broad, remedial nature and instead limited its scope to the technologies in place in 1989 .................................................. 26

II.    Federal Copyright Law Has No Relevance to Deacon's Claim and Does Not Preclude a Finding that Pandora Rents or Lends Sound Recordings to its Users ................................................. 30

A.    Federal copyright law has no relevance to Deacon's claim.. 31

B.    The District Court improperly determined that Pandora's public performance license precludes finding it a renter or lender ................................................................................. 34

CONCLUSION ........................................................................... 39

Statement of Related Cases Pursuant to Circuit Rule 28-2.6 ............... 41

Certificate of Compliance Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1 ..................................................... 42

Certificate of Service ........................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Adams v. U.S. Forest Serv.*, 672 F.3d 1138 (9th Cir. 2012) ................... 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................... 12

*Assoc. for L.A. Deputy Sheriffs v. Cnty. of L.A.*,
 648 F.3d 986 (9th Cir. 2011) ......................................... 38

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................... 12

*Bertha Building Corp. v. Nat. Theatres Corp.*,
 269 F.3d 785 (2d Cir. 1959) .......................................... 34

*Bodine v. Graco, Inc.*, 533 F.3d 1145 (9th Cir. 2008) ....................... 15, 24

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) .......................................... 31

*BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) .................................... 15

*Dix v. Am. Bankers Life Assur. Co. of Fla.*,
 415 N.W.2d 206 (Mich. 1987) .................................... 27, 29

*First Trust Co. of St. Paul v. Commonwealth Co.*,
 98 F.2d 27 (8th Cir. 1938) ............................................. 33

*Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012) ....................... 15

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) ...... 15

*Goldman v. Standard Ins. Co.*, 341 F.3d 1023 (9th Cir. 2003) ............. 33

*G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*,
 958 F.2d 896 (9th Cir. 1992) .......................................... 31

*Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ......... 31

*Herrera v. LCS Fin. Servs. Corp.*, No. C09-2843 THE,
 2009 WL 2912517 (N.D. Cal. Sept. 9, 2009) ................................. 34

*Hinds Invs., L.P. v. Angioli*, 654 F.3d 846 (9th Cir. 2011) .................... 12

*Jonah R. v. Carmona*, 446 F.3d 1000 (9th Cir. 2006) ........................... 27

*Lopez v. City of Needles, Cal.*, 95 F.3d 20 (9th Cir. 1996) ....................... 2

*Muscarello v. U.S.*, 524 U.S. 125 (1998) .................................... 17

*N.L.R.B. v. Nat. Gas Utility Dist. of Hawkins County, Tenn.*,
    402 U.S. 600 (1971) .............................................. 32 – 33

*Pakootas v. Teck Cominco Metals, Ltd.*,
    452 F.3d 1066 (9th Cir. 2006) ...................................... 12

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)...... 31

*Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*,
    492 F.3d 471 (D.C. Cir. 2007) ...................................... 33

*United States v. Am. Soc. of Composers, Authors, Publishers*,
    627 F.3d 64 (2d. Cir. 2010)...................................... 35 – 36

*Waits v. Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992) ....................... 32

*Watson v. U.S.*, 552 U.S. 74 (2007) ....................................... 15

**Statutes**

28 U.S.C. § 1291 ............................................................ 2

28 U.S.C. § 1332 ............................................................ 1

U.S. Const. art. I, § 8, cl. 8 ................................................ 31

Video Rental Privacy Act, M.C.L. §§ 445.1711 – 15 ....................... *passim*

# Federal and Circuit Rules

Circ. R. 28-2.7 ................................................................................. 2

Fed. R. Civ. P. 12(b)(6) ............................................................ 3, 12, 38

# Other Sources

Black's Law Dictionary (9th ed. 2009)................................................ 16

*Borrow*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/borrow (last accessed Apr. 22, 2013)....... 16

*Corporate Members*, CTAM, http://www.ctam.com/corporate/pages/corporate-members.aspx (last accessed Apr. 22, 2013) ................. 20

*eAudioBooks*, eBranch@RHPL, http://ebranch.rhpl.org/index.php/eaudiobooks (last accessed Apr. 22, 2013) ............................................................................... 19

*eBooks: OverDrive*, San Francisco Public Library, http://sfpl.org/index.php?pg=2000590401 (last accessed Apr. 22, 2013) ................................................................................. 19

*eLibrary – eAudioBooks FAQs*, West Bloomfield Township Public Library, http://www.wblib.org/elibrary/eaudiobooksfaq.php (last accessed Apr. 22, 2013)......................................................... 19

*eLibrary – eBooks FAQs*, West Bloomfield Township Public Library, http://www.wblib.org/elibrary/ebooksfaq.php (last accessed Apr. 22, 2013)............................................................................... 19

*Frequently Asked Questions*, Movies On Demand, http://www.rentmoviesondemand.com/faqs (last accessed Apr. 22, 2013) ............................................................................... 20

*Getting started with a Windows computer*, OverDrive Help, http://help.overdrive.com/article/0474/Getting-started-with-a-Windows-computer (last accessed Apr. 22, 2013)........................ 21

*How long do rentals last?*, Vudu Customer Help,
    https://vudu.custhelp.com/app/answers/detail/a_id/89
    (last accessed Apr. 22, 2013) ......................................................... 20

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 132, *reprinted in* 1976
    U.S.C.C.A.N. 5659 ......................................................................... 32

*iTunes Store: Movie rental frequently asked questions (FAQ)*,
    iTunes Store, http://support.apple.com/kb/ht1657 (last
    accessed Apr. 22, 2013) ................................................................ 20

Jeffrey A. Trachtenberg and Stu Woo, *Amazon, Now a Book Lender*,
    Wall Street Journal (Nov. 3, 2011),
    http://online.wsj.com/article/SB100014240529702046219045770 14
    273003626952 ................................................................................ 20

Julia Angwin and Jeremy Singer-Vine, *Facebook Isn't Free*,
    WSJ.com (Apr. 30, 2012),
    http://classroom.wsj.com/cre/2012/04/30/facebook-isnt-free/ ......... 18

*Kindle Owners' Lending Library for Amazon Prime Members*,
    Amazon.com,
    https://www.amazon.com/gp/help/customer/display.html/ref=lp_me
    m_help?ie=UTF8&nodeId=200757120 (last accessed
    Apr. 22, 2013) .............................................................................. 21

*Lend*, Merriam-Webster Dictionary, http://www.merriam-
    webster.com/dictionary/lend (last accessed Apr. 22, 2013) ........... 16

*Library Cards*, Oakland Public Library,
    http://oaklandlibrary.org/using-library/library-cards
    (last accessed Apr. 22, 2013) ......................................................... 18

*Library Cards and Circulation Policies*, Detroit Public Library,
    http://www.detroit.lib.mi.us/library-cards-and-circulation-policies
    (last accessed Apr. 22, 2013) ......................................................... 18

Pandora Form S-1 Reg. Stmt. ("Form S-1") (filed Feb. 1, 2011),
    http://www.sec.gov/Archives/edgar/data/1230276/00011931251103
    2963/ds1.htm (last accessed Apr. 22, 2013) ........................ 5, 18, 36

*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis
　　　　Section, H.B. No. 5331, Jan. 20, 1989 .......................... 17, 27, 28, 31

*Rent*, Merriam-Webster Dictionary, http://www.merriam-
　　　　webster.com/dictionary/rent (last accessed Apr. 22, 2013) ........... 16

S. Rep. No. 104-128 (Aug. 4, 1995) ........................................... 35

*SFPL Rules and Procedures*, San Francisco Public Library,
　　　　http://sfpl.org/index.php?pg=2000002001 (last accessed
　　　　Apr. 22, 2013) ................................................................. 18

*Terms and Conditions*, Redbox,
　　　　http://www.redbox.com/terms#anchor4 (last accessed
　　　　Apr. 22, 2013) ................................................................. 25

Timothy Baughman, David G. Chardavoyne, Kenneth M. Mogill,
　　　　Hon. Cynthia D. Stephens, Hon. William B. Murphy, John
　　　　VandenHombergh, *Michigan Non-Standard Jury Instr.*
　　　　*Civil § 32:10* (2012)................................................. 36 – 37

*Vudu, Inc. Terms of Service*, Vudu.com,
　　　　http://www.vudu.com/termsofservice.html (last accessed
　　　　Apr. 22, 2013) ................................................................. 25

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff is from a different state than the defendant and the claims of the putative class, which consists of at least 100 persons, exceed $5,000,000 in the aggregate. 28 U.S.C. § 1332(d)(2)(A); (ER 61, 65 at ¶¶ 10 – 12, 36.) Plaintiff-Appellant Peter Deacon is a Michigan citizen. (ER 60 at ¶ 3.) Defendant-Appellee Pandora Media, Inc. ("Pandora") is a Delaware corporation with its principal place of business in California. (ER 61 at ¶ 11.) Deacon sought statutory damages of $5,000 per person, on behalf of himself and millions of putative class members. (ER 65, 68 at ¶¶ 36, 48.)

On September 28, 2012, the District Court granted Pandora's motion to dismiss without prejudice and with leave to amend. (ER 33.). Deacon notified the District Court of his intent to stand on his complaint, (Dkt. 48), and on November 14, 2012, the District Court dismissed his complaint with prejudice and entered final judgment for Pandora. (ER 31 – 32.) Deacon timely filed his Notice of Appeal on December 12, 2012. (ER 1 – 2.)

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. *Lopez v. City of Needles, Cal.*, 95 F.3d 20, 22 (9th Cir. 1996).

## ISSUE PRESENTED FOR REVIEW

1.     Whether Deacon plausibly alleged that Pandora is "engaged in the business of . . . renting, or lending . . . sound recordings" within the meaning of Michigan's Video Rental Privacy Act, M.C.L. §§ 445.1711 – 15.

## PERTINENT STATUTORY PROVISIONS

The statutory provisions pertinent to this Appeal are set forth in Addendum A, attached hereto. *See* C.R. 28-2.7.

## STATEMENT OF THE CASE

Plaintiff-Appellant Deacon appeals the District Court's dismissal of his claim that Pandora publicly disclosed his personal music-rental and borrowing history without his consent in violation of Michigan's Video Rental Privacy Act, M.C.L. §§ 445.1711 – 15 ("VRPA" or "the Act"). (ER 58 – 71.) The District Court held that Deacon's claim failed because he did not allege any "volitional use" of sound recordings downloaded from Pandora, and he therefore could not establish—as a

matter of law—that Pandora "rented" or "lent" sound recordings as required by the statute. (ER 40 – 42.)

On September 20, 2011, Deacon filed his class action complaint against Pandora in the District Court. (ER 58 – 71.) The complaint pleaded two causes of action, alleging that Pandora disclosed Deacon's personal music-rental and borrowing history in violation of the VRPA and the Michigan Consumer Protection Act.[1]

Pandora responded on November 28, 2011, by seeking dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 20.) Pandora argued that: (i) Deacon lacked both Article III and statutory standing to sue, (ii) Pandora's services are not subject to the VRPA, (iii) Pandora's disclosures did not identify Deacon, and (iv) Deacon had supposedly consented to the disclosures in any case. (*Id.*)

On September 28, 2012, the District Court granted Pandora's motion to dismiss, holding that although Deacon had both statutory and constitutional standing to sue, the VRPA did not apply to Pandora's music service. (ER 38 – 43.) Although the District Court gave leave to

---

[1]    The District Court also dismissed Deacon's claim under the Michigan Consumer Protection Act. (ER 49.) Deacon does not appeal that portion of the District Court's ruling.

amend, Deacon chose to stand on his Complaint. (Dkt. 48.) On November 14, 2012, the District Court dismissed the case with prejudice and entered a final judgment in Pandora's favor. (ER 31, 32.) Deacon thereafter timely filed his Notice of Appeal. (ER 1 – 2.)

## STATEMENT OF FACTS

### I.    Pandora Customers Download Sound Recordings from Pandora.

Deacon's suit is the consequence of Pandora's disclosure of its Michigan users' private music rental histories. (ER 59 at ¶ 1.) Pandora owns and operates a website, www.pandora.com, that essentially functions as a massive, for-profit, online music library. (*Id*., ¶ 2.) When a customer registers for Pandora's service, Pandora prompts the customer to create a custom music "station" based on his or her music tastes, including artist, song, and genre preferences. (*Id*., ¶ 3.) Pandora stores these inputs, and uses them to electronically deliver songs suited to match the user's tastes. (*Id*.)

Pandora lends sound recordings by delivering digital song files to customers' computers. (ER 62 at ¶ 20.) While the customer's computer stores the song file, the customer listens to the song through Pandora's website, and while the song is playing, the customer has several

4

playback options, including pausing or skipping the song, or closing the Pandora website entirely. (*See id.*); *see also* Pandora Form S-1 Reg. Stmt. ("Form S-1") at 70, 72 (filed Feb. 1, 2011), http://www.sec.gov/Archives/edgar/data/1230276/000119312511032963/ds1.htm (last accessed Apr. 22, 2013). By listening through the song, skipping the song, or closing the Pandora player, the customer also deletes the temporary song file off his or her computer, thereby relinquishing control over that audio file. (ER 62 at ¶ 20.)

## II.    Pandora Disclosed Deacon's Music-Rental History to the Public At-Large.

When a customer signs up for Pandora's service, Pandora automatically creates a "Personal Page" for the customer containing "the person's full name, profile information, most recent '[Pandora music] station,' recent activity, listening history, bookmarked tracks and bookmarked artists" (collectively "Protected Information"). (ER 63 at ¶ 23; *see also* ER 67 at ¶ 43.) When Deacon created his Pandora account, and up to August 2010, Pandora's privacy policy stated that his Personal Page (and with it, his Protected Information) could *only* be viewed by the limited universe of people who (a) registered for and used Pandora, (b) knew Deacon's e-mail address, and (c) searched on

Pandora for Deacon's Personal Page. (ER 68 – 69 at ¶ 54.)

In practice, Pandora allowed search providers such as Google to index its customers' Personal Pages. (ER 60 at ¶ 6; ER 63 at 25; ER 67 at ¶ 45.) As a result, anyone and everyone with access to the Internet—along with search providers themselves—had access to Deacon's Protected Information, including his full name, music-rental history, and music preferences. (ER 60 at ¶ 6; ER 63 at 25; ER 67 at ¶ 45.)

Furthermore, on April 21, 2010, Pandora unilaterally—and without notice—integrated its users' Pandora accounts with their accounts on the Facebook social network. (ER 63 at ¶ 26.) The Facebook integration automatically disclosed Deacon's Protected Information—including his full name, music-listening history, and musical preferences—to all of his Facebook contacts who used Pandora. (ER 64 at ¶ 33; ER 67 at ¶ 45.) Pandora did not seek or obtain its customers' consent prior to integrating their Pandora accounts with their Facebook accounts nor did it give them an opt-out opportunity before doing so. (ER 63 – 64 at ¶¶ 26 – 27; ER 67 at ¶ 45.)

### III. The District Court Held that Pandora Does Not Rent or Lend Sound Recordings Because its Customers Do Not Take Possession of, Pay for, Return, or "Volitionally Use" the Audio Files Temporarily Stored on Their Computers.

Deacon brought suit under the VRPA, which prohibits any company "engaged in the business of selling at retail, renting, or lending . . . sound recordings" from disclosing "a record or information concerning the purchase, lease, rental, or borrowing of [sound recordings] by a customer that indicates the identity of the customer." M.C.L. § 445.1712. Deacon alleged that Pandora's disclosure of his Protected Information without consent violated his rights under the VRPA, and he brought suit on behalf of himself, a class of Pandora users in Michigan, and a subclass of Michigan Pandora users whose accounts were integrated with their Facebook accounts. (ER 65 at ¶ 35.)

Pandora moved to dismiss, (Dkt. 20), and the District Court held that although Deacon enjoyed both statutory and Article III standing to sue, he had failed to state a claim because the VRPA did not apply to Pandora. (ER 38 – 45.) The District Court stated two reasons for its holding.

First, the District Court concluded that both renting and lending require the distributor to release the material with the intent that the

borrower uses it. From this, the District Court held Deacon had failed to allege any "volitional use" of the sound files downloaded from Pandora, and that his only interaction with the files was passively listening to them. (ER 40 – 42.)[2] The District Court also concluded that Pandora customers do not rent or borrow the sound recordings because they do not do not pay for them, take possession of them, or return them to Pandora. Absent payment, possession, use, and return, the District Court held that Pandora did not rent or lend as those terms are used in the VRPA. (ER 42 – 43.)

Second, the District Court held that because Pandora "streams" sound recordings under federal copyright law, it cannot be held to also rent or lend those music files under the VRPA. (ER 44 – 45.) Because Pandora only has a limited license to publicly perform—in this case, by streaming—music under federal copyright law, the District Court held "it would be incongruous to find that Pandora sells, rents, or lends sound recordings to its subscribers when Pandora has no such rights to the sound recordings in the first instance." (ER 45.)

---

[2]    The District Court also held that Pandora does not sell sound recordings because it merely refers its users to third-party music sellers and does not sell sound recordings itself. (ER 43.) Deacon does not appeal that aspect of the District Court's decision.

Having read dictionary definitions narrowly and concluded that copyright law precludes a finding that Pandora rents or lends sound recordings, the District Court dismissed Deacon's VRPA claim.

## SUMMARY OF THE ARGUMENT

This Court should reverse the District Court's holding that Pandora does not rent or lend sound recordings within the VRPA's meaning for two reasons. First, the District Court ignored the commonly accepted, everyday meanings of the terms rent and lend, which demonstrate that Pandora's provision of sound recordings to its customers brings it within the VRPA's purview. The District Court held that Pandora cannot rent or lend sound recordings because its customers do not pay for, take physical possession of, return, or "volitionally use" the sound recordings downloaded from Pandora. But common language used in reference to current technology shows that when a customer downloads an electronic media file for a specific and limited purpose, and later, after a particular time period or event, that customer loses access to and control over that file, the electronic media is rented or lent, even if no payment, physical possession, or physical return takes place.

9

Likewise, while the District Court held that Pandora customers only listen to the sound recordings and do not "use" them, the District Court ignored that listening to an electronically rented audio file is analogous to reading a rented book, watching a rented movie, or listening to a rented album. And further still, by refusing to grant Pandora's customers the VRPA's protections, the District Court failed to give effect to the Act's broad remedial purpose of protecting individuals' choices in movies, music, and reading material from unwanted public disclosure.

Second, the District Court erred by holding that federal copyright law precludes a finding that Pandora rents or lends sound recordings under the VRPA. The District Court erred first by considering copyright law at all. Copyright law concerns the "bundle of rights" of content creators. The VRPA concerns the relationship between renters and their customers, and in no way concerns or turns on third-party copyrights. The District Court's second error was in applying copyright law. The District Court mistakenly determined that because Pandora supposedly "streams" sound recordings pursuant to a statutory license, it cannot also rent or lend them, despite the fact that the Copyright Act itself

contemplates that a single method of content delivery can be both a performance (*i.e.* streaming) and distribution (*i.e.*, renting or lending).

The District Court's third error in its copyright analysis was requiring Deacon to allege that Pandora had a right to distribute sound recordings under the Copyright Act as a predicate to recovery under the VRPA. Presuming that Pandora must comply with the Copyright Act, the District Court held that it would be "incongruous" to find that Pandora rented or lent sound recordings to Deacon without a license to do so. But the VRPA contains no requirement that customers like Deacon establish a defendant's compliance with copyright laws before recovering under the VRPA. Deacon's claim solely involves the relationship between him and Pandora and Pandora's failure to respect his privacy.

Accordingly, because the District Court ignored common usage and statutory purpose and required Deacon to allege copyright compliance as a predicate to recovery, its dismissal order should be reversed.

## <u>STANDARD OF REVIEW</u>

This appeal raises a single question of law—whether Pandora "rents" or "lends" sound recordings as those terms are used in the VRPA—to be reviewed *de novo*. *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072 (9th Cir. 2006) ("We review *de novo* a district court's decision on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)."). Further, when reviewing a district court's decision on a motion to dismiss, the Circuit Court "constru[es] the complaint in the light most favorable to the plaintiff . . . accepting all factual allegations as true." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and "[d]ismissal is proper where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs.*, 654 F.3d at 850.

# **ARGUMENT**

The District Court held that Pandora does not rent or lend sound recordings under the VRPA because its customers do not pay for rentals, do not take physical possession of the sound recordings, do not return them when the rental period is over, and do not "volitionally use" the rented materials. (ER 39 – 43.) The District Court then justified its holding by asserting that because Pandora does not have a license under federal copyright law to rent or lend sound recordings, it "would be incongruous" to find that Pandora exceeded the scope of its statutory license and rented or lent Deacon sound recordings. (ER 44 – 45.)

The District Court erred in both its holding and its justification. The terms "rent" and "lend," as commonly understood, apply to services like Pandora's where a customer downloads a digital media file from a provider, and, following a specified action or time period, relinquishes control of that file. In addition, the District Court's holding that federal copyright law precludes a ruling in Deacon's favor fails because compliance with copyright law simply has no relevance to Deacon's claim and Pandora's service could both "publicly perform" and "rent or lend" sound recordings under the Copyright Act.

13

Accordingly, the District Court erred and its dismissal should be reversed.

## I. The Commonly Understood, Everyday Meanings of "Rent" and "Lend" Demonstrate that Pandora Rents or Lends Sound Recordings to its Users.

Overlooking common usage and statutory purpose, the District Court held that Pandora does not rent or lend sound recordings to its customers because the customers do not pay for, take possession of, return, or "volitionally use" the borrowed materials. (ER 39 – 43.) This is incorrect for at least three reasons. First, the common understanding of "rent" and "lend" demonstrate that payment, possession, and/or return are not required elements for renting or lending. Second, Pandora's customers "use" the borrowed sound recordings in the same way consumers "use" other materials commonly understood to be "rented" or "lent." And third, in narrowly construing the meanings of rent and lend under the VRPA, the District Court disregarded the Act's broad scope and purpose.

Accordingly, and as explained below, the District Court erred by finding that Pandora does not rent or lend sound recordings, and its dismissal should be reversed.

### A.    The District Court's payment, possession, and use requirements cannot be reconciled with the everyday meanings of "rent" and "lend."

The District Court's ruling that renting and lending require payment, possession, and return is inconsistent with commonplace usage of the terms rent and lend. The VRPA does not define renting or lending, *see* M.C.L. § 445.1711, and as such, the Court must determine their "plain meaning[s]." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 796 (9th Cir. 2003). "When there is 'no statutory definition or definitive clue,' a phrase's meaning 'has to turn on the language as we normally speak it.'" *Bodine v. Graco, Inc.*, 533 F.3d 1145, 1151 (9th Cir. 2008) (quoting *Watson v. U.S.*, 552 U.S. 74, 79 (2007)); *see also Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) ("[I]t is normal usage that, in the absence of contrary indication, governs our interpretation of texts."); *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.").

Here, the District Court's payment, possession, and return requirements are incompatible with common usage. Black's Law Dictionary defines "lend" as "[a]n act of lending: a grant of something

15

for temporary use." Black's Law Dictionary (9th ed. 2009). Likewise, Webster's defines it as "to put at another's temporary disposal."[3] Similarly, Webster's defines "rent" as "to grant the possession and enjoyment of in exchange for rent,"[4] and "borrow" as "to appropriate for one's own use" or "to receive with the implied or expressed intention of returning the same or equivalent."[5] Everyday use of these terms shows that they do not require payment, physical possession, or actual return—rather they apply to services, like Pandora's, that grant customers temporary control over an electronic media file and then later, following some specified event or period of time, terminate it.

The District Court held that Deacon did not rent sound recordings because he did not pay Pandora for them. (ER 40.) But the common usage shows that rental and lending do not require payment.[6]

---

[3]    *Lend*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/lend (last accessed Apr. 22, 2013).

[4]    *Rent*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/rent (last accessed Apr. 22, 2013).

[5]    *Borrow*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/borrow (last accessed Apr. 22, 2013).

[6]    Ordinary usage is, of course, best determined by reference to examples of the term or phrase in everyday speech. With this in mind, the Supreme Court looked to examples of usage in dictionaries, the

Undoubtedly, libraries rent and lend written materials, videos, sound recordings, and their digital counterparts to their patrons; indeed, the VRPA's legislative history shows that the legislature intended the Act to apply to library rentals. *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989.[7] But most libraries do not charge their patrons for rentals and do not even charge for library membership.[8] Thus, payment cannot be a *sine qua non* of a rental or lending transaction.[9]

---

Bible, *Robinson Crusoe*, *Moby Dick*, *The New York Times*, *US News*, *The Boston Globe*, *The Colorado Springs Gazette Telegraph*, *The Arkansas Gazette*, and *The San Diego Union-Tribune* to determine the ordinary meaning of the word "carries" as used in the phrase "carries a firearm." *See Muscarello v. U.S.*, 524 U.S. 125, 127 – 32 (1998).

[7]     Because the VRPA's legislative history is not readily available in electronic form, Deacon has, for the convenience of the Parties and the Court, included a true and accurate copy in Addendum B to this brief.

[8]     *See*, *e.g.*, *Library Cards*, Oakland Public Library, http://oaklandlibrary.org/using-library/library-cards (last accessed Apr. 22, 2013); *SFPL Rules and Procedures*, San Francisco Public Library, http://sfpl.org/index.php?pg=2000002001 (last accessed Apr. 22, 2013); *Library Cards and Circulation Policies*, Detroit Public Library, http://www.detroit.lib.mi.us/library-cards-and-circulation-policies (last accessed Apr. 22, 2013).

[9]     To the extent the dictionary definition of "rent" requires an exchange of "rent" for property, Pandora admits that it primarily derives revenue through advertising. (Form S-1 at 2 ("We offer our service to listeners at no cost and we generate revenue primarily from

Likewise, the District Court held that Deacon's claims failed for want of physical possession, or actual return, of the sound recordings borrowed from Pandora. Again, however, common usage of rental and lending requires neither physical possession nor actual return. For instance, dozens of Michigan and California libraries, and millions of Michigan and California library patrons, recognize that when a customer downloads an electronic entertainment file and relinquishes control over it after a specified event or time period, the customer has rented the file. *See, e.g.*, *eLibrary – eBooks FAQs*, West Bloomfield Township Public Library, http://www.wblib.org/elibrary/ebooksfaq.php (last accessed Apr. 22, 2013) ("eBooks check out for 21 days and automatically check themselves back in."); *eLibrary – eAudioBooks FAQs*, West Bloomfield Township Public Library, http://www.wblib.org/elibrary/eaudiobooksfaq.php (last accessed Apr. 22, 2013) ("Downloadable audiobooks are similar to books on tape or CD

---

advertising.").) Thus, Deacon and the Class members gave Pandora "rent" in the form of advertising impressions and valuable personal and demographic information. (*See id.* at 46 ("We generate advertising revenue primarily from display, audio, and video advertising, which is typically sold on a cost-per-thousand impressions, or CPM, basis.")); *see also* Julia Angwin and Jeremy Singer-Vine, *Facebook Isn't Free*, WSJ.com (Apr. 30, 2012), http://classroom.wsj.com/cre/2012/04/30/facebook-isnt-free/.

except that you will use your home computer and internet connection to download the title onto your machine. Once downloaded, you can listen to the audiobook on your computer or transfer it to a compatible portable player. When the audiobook expires, it will just cease working, and you can remove it from your computer.").[10]

Likewise, Amazon.com,[11] Apple, Inc.,[12] Vudu, Inc.,[13] and the Cable & Telecommunications Association for Marketing[14] all offer digital

---

[10]    *See also eAudioBooks*, eBranch@RHPL, http://ebranch.rhpl.org/index.php/eaudiobooks (last accessed Apr. 22, 2013) ("Books may be loaned for either a 7, 10, or 14 day period . . . Your books will automatically be returned once the loan period is up."); *see also eBooks: OverDrive*, San Francisco Public Library, http://sfpl.org/index.php?pg=2000590401 (last accessed Apr. 22, 2013) ("How long is the lending period for an eBook? It is the same as for a physical book – 21 days.").

[11]    *See* Jeffrey A. Trachtenberg and Stu Woo, *Amazon, Now a Book Lender*, Wall Street Journal (Nov. 3, 2011), http://online.wsj.com/article/SB100014240529702046219045770142730 03626952.html.

[12]    *See iTunes Store: Movie rental frequently asked questions (FAQ)*, iTunes Store, http://support.apple.com/kb/ht1657 (last accessed Apr. 22, 2013).

[13]    *See How long do rentals last?*, Vudu Customer Help, https://vudu.custhelp.com/app/answers/detail/a_id/89 (last accessed Apr. 22, 2013).

[14]    The Cable & Telecommunications Association for Marketing consists of 16 cable service providers, as well as cable programming providers, studios, and suppliers, *see Corporate Members*, CTAM,

19

rental services. These services all operate similarly by providing customers with digital media files for the customers to watch, listen to, or read.[15] Then, after some time period—either a set period of time or upon a customer-initiated action—the customer relinquishes access to and control over the downloaded file.[16] In all the above examples, Pandora's competitors in the movie, book, and music industries recognize that when they provide a customer with a digital copy of a media file, and the customer's access to that file is terminated by either the expiration of some time period or upon a user-initiated event, they have rented or lent the media to the customer. Accordingly, common usage of renting and lending requires neither physical possession nor actual return—downloading followed by eventual loss of control and access suffices.

Thus, that Pandora customers do not pay for their rentals, take physical possession of them, or actually return the borrowed files to

---

http://www.ctam.com/corporate/pages/corporate-members.aspx (last accessed Apr. 22, 2013), and offers a digital rental service called Movies On Demand. *See Frequently Asked Questions*, Movies On Demand, http://www.rentmoviesondemand.com/faqs (last accessed Apr. 22, 2013).

[15]    *See* Notes 10 – 14, *supra*.

[16]    *Id.*

Pandora does not preclude a finding that Pandora rents or lends sound recordings. As with eBook and eAudioBook rentals, Pandora customers do not have to pay for their rentals. (*See* ER 40 n.4.) Instead, they must only be registered users of the Pandora's service.[17] Moreover, while Pandora customers do not physically take possession of the rented materials, they do electronically download them, (ER 62 at ¶ 20), and— as shown by eBook and eAudioBook rentals, as well as video rentals through services such as iTunes or Vudu—downloading suffices instead of taking possession when renting or lending.

Finally, while Pandora users do not return the sound recordings to Pandora, they do relinquish control over them either through a user-initiated event (such as skipping a song or closing the Pandora player) or automatically at the end of a set time period (after allowing a song to play to completion). (*Id.*) As shown by similar mechanisms employed by libraries in lending eBooks and eAudioBooks, and streaming media

---

[17]    *See Getting started with a Windows computer*, OverDrive Help, http://help.overdrive.com/article/0474/Getting-started-with-a-Windows-computer (last accessed Apr. 22, 2013) ("What you need [:] an internet connection [;] a library card."); *Kindle Owners' Lending Library for Amazon Prime Members*, Amazon.com, https://www.amazon.com/gp/help/customer/display.html/ref=lp_mem_help?ie=UTF8&nodeId=200757120 (last accessed Apr. 22, 2013).

vendors such as Apple and Vudu, relinquishing control over a digital media file suffices in lieu of actual return.

Accordingly, by finding that Pandora does not rent or lend sound recordings, the District Court ignored the commonly-accepted, everyday usages of those terms, which apply to services like Pandora's, where a customer downloads a digital media file, free of cost and for a limited duration, and relinquishes control over that file either through some volitional action on the user's part, or at the end of a designated time period.

### B.    The District Court erred by finding that Deacon does not "volitionally use" the recordings lent to him by Pandora.

The District Court held that renting and lending require the content in question to be provided for the customer to "use." (ER 40 – 42.) From this, the District Court concluded that Pandora does not rent or lend sound recordings because its customers supposedly take a completely passive role in the enjoyment of Pandora's sound recordings. (ER 40 – 43.) The District Court also concluded that Pandora's Terms of Use prohibit any use of the sound recordings provided by Pandora and that Pandora customers are instead "only authorize[d]" to listen to the

22

sound recordings. (ER 41 – 42.) The District Court erred, however because Pandora customers' interactions with their downloaded sound recordings are no different than other digital media downloads commonly accepted as lent or rented materials.

While Pandora's service may "only authorize[] subscribers to listen to music," (ER 42), library patrons "only" read books and listen to sound recordings; video store customers "only" watch movies; and Movies On Demand, iTunes, and Vudu Customers "only" watch movies. Thus, even if Pandora customers may "only" listen to their downloaded sound recordings, they still "use" the files in the same way all rented or lent material is commonly used. *See Bodine*, 533 F.3d at 1151 (where statute does not define term, common usage controls).

The District Court further erred by relying on a prohibition, set forth in Pandora's Terms of Use, purporting to bar any further use of its downloaded sound recordings. The District Court held that "Plaintiff . . . fails to confront the fact that Pandora's Terms of Use, which govern a subscriber's use of the Pandora internet radio service, foreclose any borrowing or use of any temporary song file supplied by Pandora." (ER 41) (internal footnote omitted.) "In particular," the

District Court stated, "the Terms of use plainly state that subscribers shall not 'copy, store, edit, change, prepare any derivative work of or alter in any way any of the tracks streamed through the Pandora Services[.]' TOU § 3.2." (ER 41 – 42) (modification in original.)

But the Terms of *Use* do not actually prohibit "use" of the sound files, and the restrictions they do make are indistinguishable from restrictions imposed in other rental or lending contexts. As the District Court correctly notes, Pandora's Terms of Use prohibit many things, however "use" of the sound file is not one of them. (*See* ER 57 at § 3 (listing restrictions on use of the Pandora services).) Rather, the restrictions imposed by the Terms of Use are the same restrictions imposed by other renters of books, movies, and sound recordings. See *Terms and Conditions*, Redbox, http://www.redbox.com/terms#anchor4 (last accessed Apr. 22, 2013) ("You also agree that you will not . . . modify, frame, reproduce, archive, sell, lease, rent, exchange, create derivative works from, publish by hard copy or electronic means, publicly perform, display, disseminate, distribute, broadcast, retransmit, circulate to any third party or on any third-party website, or otherwise use the Materials . . . ."); *see also Vudu, Inc. Terms of Service*,

Vudu.com, http://www.vudu.com/termsofservice.html (last accessed Apr. 22, 2013) ("You may not edit, modify, copy, distribute, transmit, download, display, perform, reproduce, license, translate, create derivative works from, transfer, alter, adapt, sell, rent or sublicense any Content, or facilitate any of the foregoing."). Thus, the *use* restrictions imposed by the Pandora Terms of *Use* do not establish that Pandora customers do not *use* the sound recordings. Instead, the restrictions are common within the rental and lending industry, and they suggest that Deacon did, in fact, rent or borrow sound recordings from Pandora.

Accordingly, to the extent showing "volitional use" is in any way required for rental or lending, the District Court erred by refusing to acknowledge that by playing, listening to, skipping, and relinquishing control over the tracks they downloaded from Pandora, Pandora's customers like Deacon "used" the sound recordings.

### C.   The District Court did not consider the VRPA's broad, remedial nature and instead limited its scope to the technologies in place in 1989.

In finding that the VRPA does not apply to Pandora's rentals, the District Court also ignored the Act's broad, remedial purpose and focused too closely on the supposedly unique nature of Pandora's

website service, rather than its routine disclosure of its customers' media listening choices. While the commonplace usages of rent and lend indicate that Pandora is subject to the VRPA, to the extent the Court finds the common usage unclear, the Court "may use canons of construction, legislative history, and the statute's overall purpose to illuminate [the legislature's] intent." *Jonah R. v. Carmona*, 446 F.3d 1000, 1006 (9th Cir. 2006).

Where consumer protection statutes are "enacted to provide an enlarged remedy for consumers who are mulcted by" a defendant's actions, they "should be construed liberally to broaden the consumers' remedy." *Dix v. Am. Bankers Life Assur. Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987). The VRPA is no exception. The Michigan legislature enacted the VRPA to "recognize that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else, for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989.

The VRPA protects customer choices and preferences with broad language, covering all transactions where entertainment content is

26

transferred from one person to another and that transfer is recorded. For that reason, the VRPA broadly protects not only books, but "books and other written materials," not only VHS tapes or movies, but all "video recordings," and not only CDs and tapes, but "sound recordings" generally. *See* M.C.L. § 445.1712. Likewise, rather than apply only to purchases, the Act covers any transfer of media whereby a record would be created of a customer's choice in music, videos, or written materials—including purchase *or* lease *or* rental *or* borrowing. *Id.*

Pandora's provision of sound recordings falls within the intended scope of the Act. As with a movie rental from a brick-and-mortar store, a CD purchase from a retailer, or a book rental from a library, when a customer rents a song from Pandora the customer takes control (electronically) of the rented media. (*See* ER 62 at ¶ 20.) Just as importantly—and as with a movie rental, CD purchase, or book rental—when a customer downloads a song from Pandora, a "*record or information concerning*" that download is created, M.C.L. § 445.1712 (emphasis added), and with it a privacy interest in that "person's choice in reading, music, and video entertainment." *Privacy: Sales, Rentals of*

*Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989.

In this way, Pandora's sound recording rentals are distinguishable from traditional "public performances" of music. When a musician plays a free public concert, the musician does not—absent some other mechanism—create a record of each individual audience member's music tastes. When a broadcast television station broadcasts a music performance, that station does not create a record of individual viewers' music tastes. And when a person listens to a song playing on terrestrial radio, the broadcaster does not create a record of that person's music-listening preferences. Pandora does. (ER 59 at ¶ 4; ER 60 at ¶ 6; ER 63 at ¶ 23.) Thus, the District Court erred by failing to protect the focal point of the VRPA's protections—the record of Deacon's music-listening history.

By focusing on the limited functionality of the Pandora music player and refusing to apply the VRPA to Deacon's rental of sound recordings from Pandora, the District Court ensured that as the entertainment technologies of the 1980s vanish from popular use, so too will the VRPA's consumer protections. Given the legislature's clear

choice to use broad language not tied to any one technology in particular, and the Michigan Supreme Court's mandate that consumer protection statutes be interpreted and applied broadly, *see Dix*, 415 N.W.2d at 209, the District Court erred in construing the VRPA narrowly, and its decision compels reversal.

## II. Federal Copyright Law Has No Relevance to Deacon's Claim and Does Not Preclude a Finding that Pandora Rents or Lends Sound Recordings to its Users.

Deacon's claims focus solely on interpretation of state law and do not incorporate, rely on, or otherwise involve interpretation of federal copyright law. Nonetheless, the District Court concluded that because Pandora purportedly has a license only to publicly perform music through its service—and not a right to distribute such content (*i.e.*, rent, lend, or sell)—Pandora could not, under any set of circumstances, rent or lend sound recordings as those terms are used within the VRPA. This conclusion fails to realize that Pandora's public performance license does not preclude a finding that Pandora also rents or lends sound recordings under either the VRPA or the Copyright Act.

Further still, the District Court then held that Deacon's VRPA claim failed because he had not alleged that Pandora had a copyright

license to distribute sound recordings in the first instance. Because the District Court incorrectly concluded that federal copyright law precluded a finding that Pandora rents or lends sound recordings, its dismissal order should be reversed.

### A.    Federal copyright law has no relevance to Deacon's claim.

Deacon's suit neither involves nor implicates federal copyright law. "The purpose of copyright law is '[t]o promote the Progress of Science and useful Arts.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (quoting U.S. Const. art. I, § 8, cl. 8). "Federal copyright law governs only copying," *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir. 1992), and serves to protect the "bundle of exclusive rights" belonging "to the owner of the copyright." *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985). "The protection of privacy is not a function of the copyright law." *Bond v. Blum*, 317 F.3d 385, 395 (4th Cir. 2003). Instead, it is the function of laws like the VRPA. *See Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989.

Simply put, nothing about Deacon's suit implicates or in any way involves the rights of the artists whose music he listened to. Deacon's suit involves two parties: himself (on behalf of all others similarly situated) and Pandora. Neither is involved in this litigation as a copyright holder, and neither is asserting ownership rights over copyrighted materials. The Copyright Act and the VRPA were enacted by separate sovereigns to deal with entirely different subjects (*i.e.* protection of intellectual property rights and protection of personal privacy rights), and the Copyright Act left the "'common law rights of "privacy," "publicity," and trade secrets . . . unaffected . . . as long as the causes of action contain elements, such as an invasion of personal rights . . . that are different in kind from copyright infringement.'" *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir. 1992) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 132, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748).

Indeed, the only connection between the two statutes is that the VRPA offers an individual privacy in his or her choice of copyrighted music, video, or written material. But then again, it could just as easily offer those protections for individuals' choices in non-copyrighted media

31

as well. *See* M.C.L. § 445.1712 (making no distinction between copyrighted and public domain media).

Nor would a finding that Pandora rents or lends sound recordings under the VRPA compel a finding that it also rents or lends sound recordings under the Copyright Act. "In the absence of a plain indication to the contrary . . . it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law." *N.L.R.B. v. Nat. Gas Utility Dist. of Hawkins County, Tenn.*, 402 U.S. 600, 603 (1971).

Furthermore, when a state intends its statute to operate independently from a federal statute, the state can give terms different definitions than used in their federal counterparts. *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1032 (9th Cir. 2003); *see also Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin.*, 492 F.3d 471, 474 (D.C. Cir. 2007) (noting that the word "conviction . . . is a chameleon with different meanings in different states, under different federal statutes, and even in different contexts in the common law.") (quotation marks and citations omitted); *First Trust Co. of St. Paul v. Commonwealth Co.*, 98 F.2d 27, 31 (8th Cir. 1938) (discussing different

32

meanings of "income" in state, federal, and municipal laws and private agreements, and noting that "'gross income,' cannot be said to convey the same definite and inflexible significance under all circumstances and wherever used. Its meaning depends on the connection in which it is used and the result intended to be accomplished.").[18]

Because this suit does not concern or implicate copyright law, and the Copyright Act and the VRPA are separate statutes intended to address entirely distinct issues, the District Court erred by adopting Pandora's red-herring copyright analysis.

### B.    The District Court improperly determined that Pandora's public performance license precludes finding it a renter or lender.

Improperly looking to federal copyright law to determine the VRPA's scope, the District Court held that Pandora does not rent or lend sound recordings because "distributing" (*i.e.*, selling, renting, or lending) requires a different statutory license than "streaming" songs,

---

[18]    *See also Bertha Building Corp. v. Nat. Theatres Corp.*, 269 F.2d 785, 788 (2d Cir. 1959) ("[T]he word 'penalty' in a federal statute has a different meaning than the same word in the New York statute."); *see also Herrera v. LCS Fin. Servs. Corp.*, No. C09-2843 THE, 2009 WL 2912517, at *2 (N.D. Cal. Sept. 9, 2009) (acknowledging that even when enacting a state counterpart to a federal act, the same term—"debt collectors"—can have a different meaning between the two statutes).

and Deacon did not allege that Pandora had a copyright license to distribute. The District Court's copyright determination is flawed for two main reasons.

First, that Pandora supposedly "streams" music under a public performance license does not preclude a finding, even under copyright law, that it also rents or lends sound recordings. The Senate Report to the Digital Performance Right in Sound Recordings Act explicitly recognizes that an activity can be both a public performance (streaming) and a sale, rental, or lease (downloading) at the same time:

> [W]here a digital audio transmission is a digital phonorecord delivery as well as a public performance of a sound recording, the fact that the public performance may be exempt from liability . . . or subject to statutory licensing . . . does not in anyway limit or impair the sound recording copyright owner's rights [concerning sale, rental, or lending] under section 106(3) . . . [or] where an interactive digital audio transmission constitutes a distribution of a phonorecord as well as a public performance of the sound recording, the fact that the transmitting entity has obtained a license to perform the sound recording does not in any way limit or affect the entity's obligations to obtain a license to distribute phonorecords of the sound recordings.

S. Rep. 104-128 at 27 (Aug. 4, 1995). Likewise, in the case used by the District Court to define "streaming," the Second Circuit recognized the same, noting that its holding "does not foreclose the possibility, under

34

circumstances not presented in [the case before it], that a transmission could constitute both a stream and a download, each of which implicates a different right of the copyright holder." *United States v. Am. Soc. of Composers, Authors, Publishers*, 627 F.3d 64, 74 n.10 (2d Cir. 2010). Pandora's own SEC registration statement even recognizes that its provision of sound recordings to its customers could be considered distribution (*i.e.*, rental or lending) under the Copyright Act:

> We do not currently pay so-called "mechanical royalties" to music publishers for the reproduction and distribution of musical works embodied in transitory copies to make stream audible to our listeners. Although not currently a matter of dispute, if music publishers were to change their position and seek to be paid mechanical royalties by us, and a final judgment were entered by a court requiring that payment, our royalty obligations could increase significantly.

*See* Form S-1 at 17.

Thus, the lower court's holding that Pandora publicly performs the sound recordings Deacon listened to, and therefore could not have rented or lent the material, was erroneous. Pandora could, and the complaint alleges that it does, (ER 62 at ¶¶ 19 – 20), distribute sound recordings.

Second, the District Court erred in holding that Deacon's claim failed because he does not allege "that Pandora possesses the requisite licenses from copyright holders to distribute copies of copyrighted sounds recording [*sic*] by sale, rental, lease or lending to the public," (ER 44), and it would therefore "be incongruous to find that Pandora sells, rents or lends sound recordings to its subscribers when Pandora has no such rights to the sound recordings in the first instance." (ER 45.) Deacon was not required to allege that Pandora had a right to distribute the sound recordings in the first instance, and his failure to do so did not permit the District Court to presume Pandora's compliance with the Copyright Act.

The elements Deacon must allege on his VRPA claim are limited and he was only required to plead that: (1) Pandora is engaged in the business of renting or lending sound recordings, (2) he rented or borrowed a sound recording from Pandora, (3) Pandora disclosed to another person, other than Deacon, a record or information concerning Deacon's rental or borrowing of the sound recording(s), and (4) the record that was disclosed identified Deacon. *See* M.C.L. § 445.1712.[19]

---

[19]    *See also* Timothy Baughman, David G. Chardavoyne, Kenneth M.

Deacon alleged, and the District Court found, that Pandora disclosed personally-identifying records or information concerning his music-listening history, (ER 59 at ¶ 1; ER 60 at ¶¶ 6, 7; ; ER 64 at 32, 33; ER 67 at 44 – 46; ER 39), and, as stated above, Deacon sufficiently alleges that he rented or borrowed those sound recordings from Pandora. Nowhere in the Act itself or its legislative history is there any indication that the aggrieved Plaintiff allege and prove that the defendant possessed the appropriate or required license to distribute the materials to the plaintiff in the first place. The Act does not distinguish between those renters and lenders who comply with the Copyright Act and those who do not—it only distinguishes between those who honor their customers' privacy and those who disregard it. Thus, the Court's holding—that a finding that Pandora rents or lends sound recordings would be "incongruous" without allegations that Pandora has a statutory copyright license to rent or lend those files in the first place—was improper.

---

Mogill, Hon. Cynthia D. Stephens, Hon. William B. Murphy, John VandenHombergh, *Michigan Non-Standard Jury Instr. Civil § 32:10* (2012).

Furthermore, the District Court's assumption that Pandora would not violate the Copyright Act is similarly improper because it favors Pandora's presumed compliance over the plain allegations of the Complaint. On a motion to dismiss, a court "accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." *Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1142 – 43 (9th Cir. 2012); *see also Assoc. for L.A. Deputy Sheriffs v. Cnty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011) (On a Rule 12(b)(6) motion, "[t]he court draws all reasonable inferences in favor of the plaintiff."). Thus, if, on the Court's view, a finding that Pandora rents or lends sound recordings under the VRPA would also compel a finding that Pandora violates the Copyright Act, so be it. The District Court cannot use presumed copyright compliance to negate the allegations in the Complaint.

Because the District Court was compelled to accept the allegations in the Complaint as true, it is irrelevant that the District Court thought it incongruous for Pandora to rent or lend sound recordings without a

statutory license, [20] and the District Court's dismissal order should be reversed.

## CONCLUSION

For the reasons stated above, this Court should reverse the District Court's September 28, 2012 Order granting Defendant's motion to dismiss, its November 14, 2012 Order granting dismissal with prejudice, and its November 14, 2012 Final Judgment, and remand for further proceedings.

Dated April 22, 2013.          Respectfully submitted,

                               *s/ J. Dominick Larry*

                               Jay Edelson (jedelson@edelson.com)
                               Ryan D. Andrews (randrews@edelson.com)
                               Ari J. Scharg (ascharg@edelson.com)
                               J. Dominick Larry (nlarry@edelson.com)
                               EDELSON LLC
                               350 North LaSalle, Suite 1300
                               Chicago, Illinois 60654
                               Tel: (312) 589-6370
                               Fax: (312) 589-6378

                               *Attorneys for Plaintiff-Appellant*
                               *Peter Deacon*

---

[20]    Of course, if the incongruity of alleging that a defendant violated a law were sufficient to warrant dismissal, the federal pleading standard would be turned on its head.

**Statement of Related Cases**
**Pursuant to Circuit Rule 28-2.6**
**for Case Number 12-17734**


Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellant is unaware of any related cases pending in this Court that arise out of the same or consolidated cases in the District Court or agency, are cases previously heard in this Court which concern the case being briefed, raise the same or closely related issues, or involve the same transaction or event.


Dated April 22, 2013                    *s/ J. Dominick Larry*

                                        Attorney for Plaintiff-Appellant
                                        Peter Deacon

**Certificate of Compliance**
**Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1**
**for Case Number 12-17734**

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7733 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Mac 2008 in 14 point Century Schoolbook font.

Dated April 22, 2013                          *s/ J. Dominick Larry*

                                      Attorney for Plaintiff-Appellant
                                      Peter Deacon

41

## <u>Certificate of Service</u>

I certify that, on April 22, 2013, I filed the foregoing Appellant's Opening Brief using the Court's electronic filing system.  I also certify that a courtesy copy of the foregoing was sent to counsel for defendant-appellee Pandora Media, Inc. by electronic mail using the email addresses indicated below:

Michele D. Floyd
ZWILLGEN LAW LLP
915 Battery Street
Second Floor, Suite 3
San Francisco, California 94111
Telephone: (415) 590-2340
michele@zwillgen.com

Marc J. Zwillinger
Jacob Alan Sommer
ZWILLGEN PLLC
1705 N Street NW
Washington, D.C. 20036
Telephone: (202) 296-3585
Facsimile: (202) 706-5298
marc@zwillgen.com
jake@zwillgen.com

Dated April 22, 2013            *s/ J. Dominick Larry*

Attorney for Plaintiff-Appellant
Peter Deacon